981 F.2d 1250
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
EQUITY CAPITAL ASSOCIATES, a South Carolina General
Partnership, Plaintiff-Appellant,
v.
SECURITY MORTGAGE CORPORATION; Gaston Federal Savings and
Loan Association; Heritage Federal Savings and Loan
Association; Davidson Federal Savings and Loan Association;
United Savings and Loan Association; Newberry Federal
Savings and Loan Association; Cherryville Federal Savings
and Loan Association; First Federal Savings and Loan
Association of Darlington; Resolution Trust Corporation,
Defendants-Appellees.
EQUITY CAPITAL ASSOCIATES, a South Carolina General
Partnership, Plaintiff-Appellee,
v.
SECURITY MORTGAGE CORPORATION; Gaston Federal Savings and
Loan Association; Heritage Federal Savings and Loan
Association; Davidson Federal Savings and Loan Association;
United Savings and Loan Association; Newberry Federal
Savings and Loan Association; Cherryville Federal Savings
and Loan Association; First Federal Savings and Loan
Association of Darlington; Resolution Trust Corporation,
Defendants-Appellants.
 Nos. 91-2705, 91-2709.
 United States Court of Appeals,
Fourth Circuit.
 Argued: September 28, 1992
Decided: December 16, 1992
As Amended Jan. 25, 1993.
 
 Appeals from the United States District Court for the District of South Carolina, at Columbia. Joseph F. Anderson, Jr., District Judge. (CA-90-135-3-16)
 ARGUED: Arthur Camden Lewis, Lewis, Babcock & Hawkins, Columbia, South Carolina, for Appellant.
 Robert E. Stepp, Glenn, Irvin, Murphy, Gray & Stepp, Columbia, South Carolina, for Appellees.
 ON BRIEF: Belton T. Zeigler, Lewis, Babcock & Hawkins, Columbia, South Carolina, for Appellant.
 Elizabeth Howard Simmons, Glenn, Irvin, Murphy, Gray & Stepp, Columbia, South Carolina, for Appellees.
 D.S.C.
 Affirmed.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and PHILLIPS and WILLIAMS, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Equity Capital Associates, a South Carolina general partnership ("ECA") appeals from a judgment rejecting its several related claims in tort and contract against a consortium of savings and loan institutions headed by Security Mortgage Corporation (collectively "Security" or "the lenders") growing out of a failed real estate venture in which ECA lost a substantial investment allegedly as a result of various acts of fraud and contract breach perpetrated by Security in conjunction with a loan commitment letter that it issued. We find no reversible error and affirm.
 
 
 2
 * This case arose from the failed effort of real estate developer William P. Charping to develop a 177-acre tract of land-ultimately to be called EastPort-on the Intracoastal Waterway near Little River, South Carolina. At the time the critical events leading to this lawsuit began, Charping had obtained a contract to buy the tract for just over $4 million and was seeking financing for its acquisition and development. Through the efforts of his then attorney, Edward G. Menzie, and Menzie's colleague, attorney David Whitener, a consortium of savings and loan institutions, headed by Security Mortgage Corporation, was put together for this purpose. In June 1986, Security issued a conditional loan commitment letter to Charping and his then wholly-owned corporation, ResortMaster, for a $7,800,000 acquisition and development loan (the A & D loan) to be used on the EastPort project. The letter required a $1 million equity participation by the borrower, and explicitly provided that the final loan documents might "impose material covenants, terms, conditions, obligations, or other requirements on the borrower and the guarantors in addition to, but not contrary to, those set forth herein."
 
 
 3
 To obtain the required $1 million in equity, and for tax reasons, Charping sought an outside investment of capital. Through the efforts of Milton P. Moore, the ECA general partnership was formed for this purpose. The partnership consisted of thirty-eight partners, among them attorneys, accountants, real estate developers, bankers and physicians, with Moore acting as managing general partner. Pursuant to a financing arrangement negotiated between Moore and Charping, ECA agreed to issue letters of credit totalling $1.5 (later increased to $2 million) to Charping. In return, ECA was to receive quarterly interest on advances made under the letter of credit and a share of Charping's profits from the EastPort development. If things went as Moore, the organizer, projected, the partners would realize a substantial and speedy profit on ECA's investment in the Charping venture. As later was recognized by all concerned, the ECA-Charping agreement constituted a security which should have been registered under S.C. Code Ann. § 35-1-810, but was not.
 
 
 4
 In its dealings with Charping and Security looking to the closing of the A & D loan and the related issuance of ECA's letters of credit, ECA was initially represented by separate counsel, but eventually, through Moore, relied upon attorney Menzie. Simultaneously, Menzie was a partner in the law firm which served as general counsel for Security and its savings and loan parent institution. During these closing negotiations, however, Security's attorney of record was Menzie's colleague, Whitener. It is undisputed that during this time, ECA, through Moore, knew of Menzie's representation of Charping, though it claimed not to know of his law firm's relationship with Security until after the A & D loan closed.
 
 
 5
 The final A & D loan documents were incorporated by reference in the ECA-Charping agreement, and drafts were sent to Charping for pre-closing review. In their final form the documents contained material additions to critical provisions of the loan commitment letter. For example, the final A & D loan documents required $1 million principal payments every six months, whereas the commitment letter had indicated interest-only payments for three years with a final balloon payment of principal and interest. The documents also contained a considerably expanded list of development funding conditions from those provided in the commitment letter.
 
 
 6
 Though Moore acknowledged that ECA "had access to all information reasonably requested concerning all matters which are the subject of (the ECA-Charping) Agreement, the (A & D) Loan ... and the ability of Charping and/or ResortMaster to perform their respective obligations under the terms of (the ECA-Charping) Agreement", it is undisputed that neither he as managing general partner nor, apparently, any other ECA partner reviewed the A & D loan documents before loan closing. The A & D loan to Charping's EastPort development project was closed on August 19, 1986 and ECA only posted its first letters of credit to Charping on August 27, after the loan had closed on the final documents. The first $1 million of the credit then and later advanced by ECA was used to provide the $1 million equity required of the borrower in the loan commitment letter. Ultimately, a total of $2 million was provided Charping's project by ECA letters of credit issued pursuant to the original ECA-Charping agreement and a later modification that increased the total commitment of credit to $2 million.
 
 
 7
 The A & D loan by Security was declared in default in December 1988 and again, after a restructuring, in 1989. The loan was then foreclosed and the EastPort project purchased by the lenders. In consequence, ECA lost the entire $2 million invested in the EastPort project by way of letters of credit issued pursuant to the ECA-Charping agreement.
 
 
 8
 Seeking to recover its loss and related damages, ECA brought this action in a South Carolina state court against Security and the other members of the lender consortium. A total of ten claims was alleged: (1) fraud; (2) fraud and fraudulent concealment; (3) negligent misrepresentations; (4) direct breach of fiduciary duty by the lenders; (5) breach of fiduciary duty by the lenders' agent-law firm; (6) intentional interference with contractual and fiduciary relations; (7) breach of contract by fraudulent act; (8) breach of contract/third party beneficiary; (9) civil conspiracy; and (10) lender liability.
 
 
 9
 This great multiplicity of overlapping and largely alternative claims was based upon a common core of factual allegations and a central factual theory. The essence of the theory was as follows.
 
 
 10
 The Security consortium of lenders had deliberately (or at least negligently) enticed ECA into investing to its detriment in Charping's EastPort development project by misleading ECA as to the actual terms of the A & D loan upon which the project's success, hence ECA's financial prospects as investor, depended. This misleading was accomplished by Security's use of attorney Menzie, a member of the law firm then acting as Security's general counsel, both to draft the critical changes in the loan documents and then to prevent Moore, ECA's managing partner, from reviewing the unfavorable changes before the loan closed. As a result of this fraudulent contrivance by the Security consortium, ECA made its investment in Charping's project on the mistaken assumption that the critical loan terms which Charping must meet were those set out in the commitment letter. Because instead they were, by virtue of Menzie's, hence Security's, chicanery much more onerous, Charping's venture was doomed from the start to fail and quickly did, leading to the lenders' foreclosure purchase, Charping's ruin, and ECA's loss of its total investment. Had ECA but known of the drastic changes between commitment letter and final loan documents, it would not have made the investment and suffered any loss. The lenders' conduct therefore had caused the loss sustained. Security's motive in this fraudulent course of conduct was to close a loan highly advantageous to the lender consortium; Menzie's motive, as willing instrument of Security's design, was to collect substantial legal fees dependent upon the closing.
 
 
 11
 While the action was pending in state court, the Resolution Trust Company was appointed receiver for Security's failed parent savings and loan institution, and the action was then removed to federal court under 12 U.S.C. § 1441(1)(3).
 
 
 12
 Following discovery, the district court, applying South Carolina law, dismissed all the claims except those for civil conspiracy and intentional interference with contractual and fiduciary relations by two successive partial summary judgments. Additionally, the court ruled that any recovery by ECA should be limited to $1 million, the initial amount issued under ECA's letters of credit to supply the borrower's required equity.
 
 
 13
 In general terms, the basis for dismissal of the several claims by summary judgment was as follows:
 
 
 14
 The fraud, fraudulent concealment, and negligent misrepresentation claims were dismissed on the basis that as a matter of law on the summary judgment record ECA could not reasonably have relied upon the loan commitment letter as a representation that it embodied the final terms of the loan closing documents.
 
 
 15
 The two breach of fiduciary duty claims were dismissed on the basis that as a matter of law on the summary judgment record no fiduciary relationship had been shown between the lenders' consortium and ECA.
 
 
 16
 The two breach of contract claims, which alleged breach of the loan commitment letter, were dismissed on the basis that ECA was not a party to the loan commitment, hence could not sue directly for its breach; that neither was it entitled to sue as a third party beneficiary because of a lack of evidence of any direct intention by the lenders to benefit ECA; alternatively, that the loan commitment merged into the final loan terms; and finally, that there was no breach of the loan commitment in any event because of its express provisions for modification of its terms.
 
 
 17
 The "lenders' liability" claim, based upon allegations of a joint venture with Charping which exposed the lenders to liability for Charping's obligations to ECA, was dismissed on the basis that as a matter of law no joint venture, merely a debtor-creditor relationship, had been shown between these parties.
 
 
 18
 With the above claims dismissed pre-trial, only the civil conspiracy and intentional interference with contractual and fiduciary relationships claims went to trial. Both were dismissed by directed verdict at the conclusion of ECA's evidence.
 
 
 19
 The civil conspiracy claim, which alleged in the alternative a conspiracy between attorney Menzie, attorney Whitener, and the lenders, and a conspiracy between the two attorneys for which the lenders were liable vicariously, were dismissed primarily on the basis that the evidence at trial was insufficient to prove that the lenders had either entered into or ratified a conspiracy with the specific intent to injure ECA required by South Carolina law.
 
 
 20
 The intentional interference claim, which alleged that the lenders interfered with ECA's contract with its lawyer, Menzie, by inducing Menzie to default on his contractual obligations of faithful representation, was dismissed on the basis that there was no evidence that the lenders knew there was any such contractual relationship between Menzie and ECA with which to interfere.
 
 
 21
 This appeal by ECA followed.[1] On it, ECA clearly has identified as an issue the dismissal by directed verdict of its civil conspiracy claim, and less clearly, but sufficiently we have assumed to require our consideration, see Rule 28(a)(3), F.R.A.P., the grant of summary judgment dismissing its three fraud claims and its third-partybeneficiary contract claim.
 
 II
 
 22
 The district court's dismissal of all the claims, including those challenged on this appeal, by summary judgment and directed verdict was supported by three opinions memorializing the court's reasoning for its rulings. See J.A. 45-53, 1296-1332 (summary judgment orders); 1323-1337 (directed verdict order). We have carefully considered the court's reasons for the challenged rulings, the briefs and oral arguments advanced by the parties in support of and challenging those rulings, and the relevant portions of the record, and we find no reversible error in the rulings and resulting judgment. In particular, we agree with the court's conclusions that on the summary judgment record the various fraud and misrepresentation claims failed as a mat ter of law for want of sufficient evidence of reasonable reliance by ECA; and that the third-party beneficiary contract breach claim failed for want of proof of a specific intent by the lenders to benefit ECA by the issuance of its loan commitment. And we agree with the court's conclusion in directing a verdict for the lenders on the civil conspiracy claim that the evidence was insufficient to support a jury finding that the lenders had the specific intent to injure ECA required to make out a case of civil conspiracy under South Carolina law.[2] Because the district court's opinions adequately and correctly explain its rulings and the state law authorities upon which they are based, we affirm on its reasoning.
 
 AFFIRMED
 
 
 [1]
 The lenders also noted a "cross-appeal" (not needed to raise the issue) challenging the district court's failure to dismiss all the claims on the alternative basis that the failure to register the ECA-Charping agreement as a security precluded recovery by ECA under South Carolina security law. In view of our disposition, we do not address that issue
 
 
 [2]
 At oral argument, we expressed some uncertainty about the nature of civil conspiracy under South Carolina decisional law. Noting that there seemed to be some intimations that a claim for civil conspiracy could not lie where the claims of underlying substantive wrong failed, or possibly that an election between the two was required, we requested supplemental briefing. It was received, and conflicted fundamentally on the point raised. We need not attempt to resolve the conflict, however, in view of our agreement with the district court that in any event specific intent to injure is an element of the claim and that the evidence here was insufficient to take that issue to the jury